# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

J.P. MORGAN TRUST COMPANY,
N.A., a national banking association,
as trustee,

        Plaintiff,

   v.                                        Case No. 04-C-0158

U.S. BANK, N.A., a national banking
association,

        Defendant and Third-Party
        Plaintiff,

   v.

JENNIFER EASTON,
        Third-Party Defendant and
        Counterclaimant

## DECISION AND ORDER

Plaintiff J.P. Morgan Trust Company, N.A. ("Morgan"), a national banking association,[1] brings this action against U.S. Bank, N.A ("the Bank"), also a national banking association,[2] alleging that it wrongly dishonored Morgan's draw on a letter of credit ("letter" or "credit"). The Bank brings a third-party action against Jennifer Easton ("Easton"), a Minnesota citizen, seeking indemnification for the amount of any judgment that Morgan might obtain against it plus its expenses and attorneys' fees. Easton brings claims against

---

[1] Morgan is organized in California, and its principal place of business is California.

[2] The Bank is organized in Ohio, and its principal place of business is Minnesota.

the Bank, alleging that it mishandled the credit, and against Morgan, alleging that it wrongfully attempted to draw on the credit.

I have diversity jurisdiction over Morgan's action against the Bank. See 28 U.S.C. §§ 1332 (diversity jurisdiction statute); id. § 1348 (stating that for jurisdictional purposes, national banking associations are deemed citizens of the states in which they are located); Firstar Bank, N.A. v. Faul, 253 F.3d 982, 994 (7th Cir. 2001) (holding that for purposes of § 1348, a national banking association is located in the state listed in its certificate of organization and in the state that is its principal place of business). I have supplemental jurisdiction over the Bank's and Easton's claims against each other and over Easton's claims against Morgan, because such claims are so related to Morgan's claims that they form part of the same case or controversy. See 28 U.S.C. § 1367(a). Before me now are Morgan's motion to dismiss Easton's claims, Morgan's and the Bank's cross-motions for summary judgment, Easton's motions for summary judgment against Morgan and the Bank, and the Bank's cross-motion for summary judgment against Easton.

## I. BACKGROUND

**A.      The Underlying Transaction**

In 1999, Easton assisted the Cheyenne River Sioux Tribe ("Tribe") in establishing a commercial buffalo farm. The Tribe formed Pte Hca Ka, Inc. ("the Corporation") to own and operate the farm. To finance the enterprise, the Corporation sold $4.65 million in bonds and granted the bondholders a security interest in the buffalo herd and slaughterhouse equipment and a mortgage on certain land. In addition, at Easton's request, the Bank issued an irrevocable standby letter of credit in the amount of $2.2

2

million.[3] The letter stated that it would expire on May 15, 2000 but would automatically renew for successive one-year periods unless sixty days prior to the end of a period the Bank stated that it would not permit renewal.

The bondholders established a trust to hold their security interests and appointed Morgan as trustee,[4] and the Corporation entered into a trust agreement with Morgan[5] pursuant to which Morgan became the holder of the security interests and the beneficiary of the letter. The trust agreement provided that if the Corporation defaulted on the bond payments, Morgan had to look first to the herd and equipment, second to the mortgage and third to the letter of credit. Further, Morgan could draw on the letter only to the extent necessary to cure the default. However, if the Bank declined to automatically renew the letter for any period prior to May 15, 2003, Morgan could draw the full amount of the credit even if the Corporation had not defaulted. The letter recited the security arrangements set forth in the trust agreement and stated that Morgan could draw upon it by submitting a sight draft[6] accompanied by documentary evidence indicating either that the Corporation had

---

[3] Technically, the Bank's predecessor, Firstar Bank Milwaukee, N.A., issued the letter.

[4] In transactions involving numerous bondholders, the bondholders often establish trusts to hold their security interests. See George Gleason Bogert & George Taylor Bogert, The Law of Trusts & Trustees § 250 (rev. 2d ed. 1992). In many situations involving bond sales, federal law requires the establishment of a trust for the benefit of the bondholders. See 15 U.S.C. §§ 77aaa – 77bbbb (Trust Indenture Act).

[5] Technically, the Corporation entered into a trust agreement with Morgan's predecessor, Bank One Colorado, N.A.

[6] A sight draft is one that is payable on the bearer's demand or on proper presentment. Black's Law Dictionary 508 (7th ed. 1999).

3

defaulted on its bond payments and that Morgan had foreclosed on the herd and equipment, or that the Bank had declined to automatically renew the credit.

**B.    Morgan's Attempted Draw**

Shortly after the Corporation began operating the buffalo farm, the Corporation defaulted on its obligation to the bondholders. Further, although the final expiration date of the letter of credit was fast approaching, Morgan had not yet attempted to foreclose on the herd or equipment or on its mortgage. Nevertheless, on May 14, 2003, Morgan submitted a sight draft for the full amount of the credit and certified that the Bank had declined to permit the credit to automatically renew. Although the Bank had not sent Morgan a non-renewal notice, Morgan contends that it non-renewed because the letter itself stated that "in any event, this letter of credit shall not be automatically extended beyond May 15, 2003, the final expiration date." (Letter of Credit at 2) (capital letters omitted).[7] The Bank did not honor Morgan's attempted draw on the ground that it had not non-renewed, whereupon Morgan commenced the present suit.

## II. APPLICABLE STANDARDS OF REVIEW

**A.    Motion to Dismiss Standard**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. <u>Gen. Elec. Capital Corp. v. Lease Resolution Corp.</u>, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal of an action under such a motion is warranted only if it is clear that the plaintiff can prove no set of facts in support of his claims that would entitle him to relief. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

---

[7]The letter is attached to Darren K. Cottriel's Declaration as Exhibit 14  [R. 68].

4

The essence of a Rule 12(b)(6) motion is not that the plaintiff has pleaded insufficient facts; it is that even assuming all of his facts are accurate, he has no legal claim. Payton v. Rush-Presbyterian-St. Luke's Med. Ctr., 184 F.3d 623, 627 (7th Cir. 1999). In ruling on such a motion, a court must assume that all of the facts alleged in the complaint are true and draw all reasonable inferences from those facts in the light most favorable to the plaintiff. Bethlehem Steel Corp. v. Bush, 918 F.2d 1323, 1326 (7th Cir. 1990).

**B.    Summary Judgment Standard**

Summary judgment is required "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." Id. For the fact to be material, it must relate to a disputed matter that "might affect the outcome of the suit." Id. In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the record – only those inferences that are reasonable." Bank Leumi Le-Israel, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991).

5

### III. DISCUSSION

Morgan claims that the Bank improperly refused its request for payment under the letter of credit. The Bank denies that it acted improperly, but claims that to the extent it is liable to Morgan, Easton must indemnify it. Finally, Easton claims that Morgan is liable to her because of its conduct in connection with the credit. Before discussing the merits of these claims, however, I will first provide an overview of letter of credit law.

**A.      Letters of Credit**

A letter of credit transaction is typically a three-party arrangement involving two contracts and the letter itself. John F. Dolan, The Law of Letters of Credit ¶ 2.01 (rev. ed. 2003); 3 James J. White & Robert S. Summers, Uniform Commercial Code § 26-2, at 112-13 (4th ed. 1995). The parties are the bank that issues the letter ("bank" or "issuer"), the customer that requests the letter ("customer" or "applicant"), and the party entitled to draw on the credit ("beneficiary"). 3 White & Summers, supra, § 26-2. The two contracts are the contract between the applicant and the beneficiary governing the business transaction in which they are both involved (the "underlying contract") and the contract between the applicant and the bank in which the bank agrees to issue the credit (the "application agreement"). Id.; see also Dolan, supra, ¶ 2.01. Typically, the contract between the applicant and the bank requires the applicant to reimburse the bank for funds drawn by the beneficiary pursuant to the credit. 3 White & Summers, supra, § 26-2. Finally, the letter itself is an "undertaking" or "engagement" involving the bank and the beneficiary.[8]

---

[8]Although courts and litigants often characterize a letter of credit as a "contract" involving the bank and the beneficiary, the leading commentators discourage such usage because a letter of credit is not a contract. See Dolan, supra, ¶ 2.02[1]; 3 White & Summers, supra, § 26-2, at 113.

6

A letter of credit serves the purpose of assuring "swift and reliable payment in commercial transactions." Eaken v. Cont'l Ill. Nat'l Bank & Trust Co., 875 F.2d 114, 115 (7th Cir. 1989). To effectuate this purpose, letters are governed by the "independence principle," i.e., they are independent of both the underlying contract and the application agreement. Dolan, supra, ¶¶ 2.01, 3.03[6]; 3 White & Summers, supra, § 26-2. Thus, the independence principle requires an issuer to pay a beneficiary on a proper demand even if the beneficiary breached the underlying contract. See Teleport Communications Group, Inc. v. Barclay Financial Group, Ltd., 176 F.3d 412, 414 (7th Cir. 1999) (stating that "[t]he purpose of a letter of credit is to provide a means of assuring payment cheaply by eliminating the need for the issuer to police the underlying contract") (internal quotation marks and citation omitted). The independence principle also requires banks to structure letters of credit so that they will be able to determine whether a beneficiary is entitled to payment simply by reviewing the documents that the beneficiary submits and comparing them to the terms of the credit. Id. (stating that "the issuer's promise to pay on a letter of credit is conditioned only on the presentation of specified documents"); Transparent Prods. Co v. Paysaver Credit Union, 864 F.2d 60, 63 (7th Cir. 1988) (stating that "[l]etters of credit give assurance of payment; to promote the reliability of the device, courts do not look beneath the surface of the documents to discover side agreements, discover the intent of the parties, and the like"); Instituto Nacional De Comercializacion Agricola (Indeca) v. Cont'l Ill. Nat'l Bank & Trust Co., 858 F.2d 1264, 1269 (7th Cir. 1988) (stating that "[a]ll letters of credit are bottomed on the principle that the parties are not required to look beyond the face of the documents presented") (internal quotation marks and citation omitted, emphasis in original); 3 White & Summers, supra, § 26-5 (stating that "[e]vents or circumstances

7

outside the presented documents and the letter itself must not determine whether the issuer has a duty to pay in any given case").

Letters of credit come in two broad varieties, "commercial" and "standby." See Dolan, supra, ¶ 1.01; 3 White & Summers, supra, § 26-1. The present case involves a standby letter, i.e., one that serves as a "back up" in the event that the applicant (or, as here, someone designated by the applicant) defaults on its obligation to the beneficiary. 3 White & Summers, supra, § 26-1(b); see also Dolan, supra, ¶ 1.04. Because it may be difficult to definitively establish a default using only documentary evidence, a standby credit is generally payable when the beneficiary submits a draft and certifies that there has been a default. Dolan, supra, ¶ 1.04. As discussed, the bank must accept the beneficiary's certification and cannot examine the facts of the underlying transaction. However, if the beneficiary submits a facially inaccurate certification, both the bank and the applicant may be able to proceed against the beneficiary. See Wis. Stat. § 405.111(1) (governing warranties). See generally John F. Dolan, Letters of Credit, Article 5 Warranties, Fraud, and the Beneficiary's Certificate, 41 Bus. Law. 347 (1986) (hereinafter "Article 5 Warranties"). Further, if the beneficiary submits a forged or fraudulent certification, a bank may refuse payment. See Wis. Stat. § 405.114(2).

With these principles in mind, I turn to the parties' claims.

**B.    Morgan's Claim Against the Bank**

Morgan claims that the Bank wrongfully refused to honor its request for payment under the letter and thus violated Wis. Stat. § 405.115(1) (authorizing recovery for a

8

wrongfully dishonored draft).[9] To determine whether the Bank acted improperly, I must first decide whether Morgan's request complied with the terms of the credit. See UCP 500, arts. 13a & 14b. In making this determination, I note first that neither the UCP nor the UCC instructs courts how to construe letters of credit. Courts, therefore, apply ordinary interpretive principles. 3 White & Summers, supra, § 26-5b, at 141. Although courts sometimes apply rules governing the construction of contracts to credits, such rules should be applied only when doing so would not undermine the unique purpose of credits. See Dolan, supra, ¶ 4.08. As discussed, central to such purpose is the independence principle and the rule that the decision whether to pay a beneficiary be based solely on comparing the documents submitted to the terms of the credit. Thus, when a credit's terms are clear, a court should not construe them at all. See id. ¶ 4.08[4]. A court should engage in interpretation only if a credit is ambiguous, i.e., "when with equal plausibility [it] can be read more than one way." Id.; 3 White & Summers, supra, § 26-5b.

In the present case, the letter states:

---

[9] I note that there are several sources of letter of credit law. The chief sources are Article 5 of the Uniform Commercial Code ("UCC") and the Uniform Customs and Practice for Documentary Credits ("UCP 500" or "UCP"). The UCP is a publication of the International Chamber of Commerce and applies to letters of credit that incorporate it by reference. See UCP 500, art. 1. Because the UCP does not cover all of the legal aspects of letters of credit, Article 5 of the UCC also applies to credits which incorporate the UCP. Finally, because the UCC also does not cover all of the legal aspects of letters of credit, courts fill in the gaps by applying common law principles and by looking to the customs and practices of the banking industry. See Dolan, supra, ¶ 4.01[1].

In the present case, the Bank's letter of credit incorporates the UCP. Thus, in resolving Morgan's claims against the Bank, I apply the UCP, the UCC, and common law principles. Further, because neither Morgan nor the Bank argues that their claims involve a genuine conflict of laws, I apply Wisconsin's version of the UCC. See Sharp ex rel. Gordon v. Case Corp., 227 Wis. 2d 1, 10-11 (1999) (holding that where there is no genuine conflict between other jurisdiction's law and Wisconsin's, court should apply Wisconsin law).

9

> PAYMENT UNDER THIS LETTER OF CREDIT IS AVAILABLE BY [Morgan's] DRAFT(S) AT SIGHT . . . TO BE ACCOMPANIED BY EITHER OF THE FOLLOWING DOCUMENTS:
>
> A) STATEMENT FROM [Morgan certifying that the Corporation is in default and that Morgan has foreclosed the security interest and mortgage and that the proceeds from such foreclosures were insufficient to cure the default]
>
> OR;
>
> B) OUR NON-RENEWAL NOTICE
>
> IT IS A CONDITION OF THIS LETTER OF CREDIT THAT IT SHALL BE DEEMED AUTOMATICALLY EXTENDED, WITHOUT AMENDMENT, FOR AN ADDITIONAL ONE YEAR PERIOD FROM THE PRESENT OR ANY FUTURE EXPIRY DATE, UNLESS AT LEAST SIXTY (60) DAYS PRIOR TO THE THEN CURRENT EXPIRY DATE WE NOTIFY YOU IN WRITING, BY CERTIFIED MAIL OR COURIER, OF OUR INTENTION NOT TO EXTEND THIS LETTER OF CREDIT FOR ANY ADDITIONAL PERIOD. UPON RECEIPT BY YOU OF SUCH NOTICE OF NON-RENEWAL YOU MAY THEN DRAW HEREUNDER WITHIN THE THEN CURRENT EXPIRY DATE, AND UP TO THE THEN AVAILABLE AMOUNT BY PRESENTATION OF YOUR DRAFT DRAWN ON US AT SIGHT ACCOMPANIED BY A WRITTEN STATEMENT FROM THE TRUSTEE STATING THAT: "WE HEREBY CERTIFY THAT WE HAVE RECEIVED NOTICE FROM [U.S. Bank] THAT THEY DO NOT INTEND TO EXTEND THEIR LETTER OF CREDIT NO. S103966 BEYOND THE CURRENT EXPIRATION DATE." IN ANY EVENT THIS LETTER OF CREDIT SHALL NOT BE AUTOMATICALLY EXTENDED BEYOND MAY 15, 2003, THE FINAL EXPIRATION DATE.

(Letter of Credit at 1-2) (capitalization in original).[10]

The credit is ambiguous concerning what documents must be submitted as a condition of payment. The first paragraph permits Morgan to present a sight draft and either a statement that the Corporation has defaulted or the Bank's non-renewal notice, but the following paragraph permits it to present a sight draft and certify receipt of a non-renewal notice. The credit is thus ambiguous as to whether Morgan must submit <u>both</u> a

---

[10]Hereafter, I will not use all capital letters when quoting from the letter of credit.

10

non-renewal notice and a certification, or whether submitting only one or the other is sufficient. However, unless I accept Morgan's argument that the letter itself constitutes a non-renewal notice (which, as explained below, I do not), I need not resolve this ambiguity. This is so because the evidence establishes that Morgan falsely certified that it had received a non-renewal notice. Putting aside the letter, it is undisputed that the Bank never sent Morgan a non-renewal notice, and as previously explained, under the UCC an issuer need not honor a request for payment when it knows that the documents submitted in support of the request are fraudulent. See Wis. Stat. § 405.114(2).

      Further, Morgan's argument that the letter itself constitutes a non-renewal notice fails. The credit states that it will be automatically extended for additional one year periods up until May 15, 2003, "unless at least sixty (60) days prior to the then current expiry date we notify you in writing, by certified mail or courier, of our intention not to extend this letter of credit for any additional period." In the next sentence, the credit authorizes Morgan to draw upon it "upon receipt of such notice of non-renewal." The phrase "such notice of non-renewal" refers to the notice described in the previous sentence. Thus, under the letter, a non-renewal notice must, among other things, notify Morgan of the Bank's intention not to extend the letter "for any additional period." (Emphasis added.) However, the letter does not do so. To the contrary, it states that the Bank may in fact extend the letter for up to three additional periods, i.e., for "additional one year period[s] from the present or any future expiry date" up until May 15, 2003. In addition, although the letter contains a "final expiration date" of May 15, 2003, it leaves open the possibility that the Bank might extend it beyond that date, stating only that it will not be "automatically extended" beyond May 15,

11

Case 2:04-cv-00158-LA   Filed 08/09/05   Page 11 of 17   Document 117

2003. (Emphasis added.) Thus, the letter of credit does not satisfy the requirements of a non-renewal notice.

Additionally, treating the letter as a non-renewal notice would produce absurd results. Because the letter authorizes Morgan to draw on it "upon receipt" of the non-renewal notice, if the letter were a non-renewal notice, Morgan could have drawn the full amount of the credit as early as the day the credit was created provided that the Bank mailed the letter to Morgan by certified mail on that day. This result would be absurd because a letter of credit is designed to provide for payment upon the happening of certain events subsequent to its issuance. A letter of credit enabling the beneficiary to draw on it immediately is in essence a money order. Accordingly, the letter of credit is not itself a non-renewal notice.

One final matter warrants mention. Before Morgan requested payment under the credit, it asked the Bank if its interpretation of the letter was correct, and a Bank employee responded affirmatively.[11] Morgan argues that as a result, the Bank is "bound" by the interpretation. (See Mem. of P. & A. in Supp. of Mot. for Summ. J. [R. 62] at 18-22.) However, Morgan cites no authority for the proposition that an employee's erroneous interpretation of a letter of credit binds a bank,[12] and no evidence indicating that it relied on the interpretation to its detriment. Thus, I attribute no significance to the employee's interpretation.

---

[11] Technically, an attorney for the majority bondholder asked the question.

[12] Morgan cites Fed. R. Evid. 801(d)(2)(D), but the citation is frivolous because the rule governs the admissibility of evidence and does not give rise to rights and obligations.

12

In short, since the Bank did not provide a non-renewal notice to Morgan, Morgan's certification to the contrary was fraudulent. Therefore, pursuant to Wis. Stat. § 405.114(2), the Bank was entitled to dishonor Morgan's draw. I will therefore deny Morgan's motion for summary judgment and grant the Bank's cross-motion.

## C.     The Bank's and Easton's Claims Against Each Other

Easton entered into two agreements with the Bank. First, she signed a "customer consent and reimbursement agreement" with the Bank's Minnesota branch ("reimbursement agreement"), in which she agreed to reimburse the Bank for funds drawn pursuant to the credit and for the Bank's costs in connection with the credit. Second, pursuant to the reimbursement agreement, Easton became a party to a "standby letter of credit application and agreement" between the Bank's Minnesota and Milwaukee branches ("application agreement").[13] The application agreement includes the following provisions:

> **Reimbursement/Indemnities.** Except for [the Bank's] liability resulting from [its] own willful misconduct or wanton disregard of [Easton's] rights hereunder, [it] shall have no responsibility to, and [Easton] unconditionally and irrevocably indemnif[ies] [it] against, each and every claim, demand, liability, loss, cost or expense which [it] may incur (or be entitled to collect) arising out of the issuance and handling of any Credit and any transactions related to the Credit, the collection of any Drafts or documents under the Credit, or any act or omission by [it] in connection with this Agreement . . . , however and whenever arising. [Easton] hereby waive[s] any claim, defense, setoff, deduction and/or suspension of performance regarding [her] obligations under this Agreement or regarding any Credit based upon any actions or inactions of [the Bank] or any third party, except [the Bank's] willful misconduct or wanton disregard of [Easton's] rights hereunder.
>
> . . . .

---

[13]Easton attaches both agreements as Exhibit 8 to her brief in support of her motion for summary judgment [R. 73].

13

> **Expenses and Attorneys' Fees.** [Easton] will reimburse [the Bank] for all attorneys' fees and all other costs, fees and out-of-pocket disbursements (including fees of [the Bank's] inside counsel and outside counsel) incurred by [the Bank] in connection with any Credit, and the enforcement of this Agreement and the collection of any monies due [the Bank] hereunder.

The Bank argues that the application agreement requires Easton to indemnify it for the costs and attorneys' fees it incurred in the present lawsuit. Easton disagrees, arguing that by erroneously interpreting the letter, the Bank committed willful misconduct and/or acted in wanton disregard of her rights.[14] Easton's argument fails for several reasons. First, although the "Reimbursement/Indemnities" paragraph in the application agreement contains exceptions for willful misconduct or acts in wanton disregard of Easton's rights, the "Expenses and Attorneys' Fees" paragraph does not. Thus, even if the Bank committed willful misconduct or acted in wanton disregard of Easton's rights, Easton would still be liable for the Bank's expenses and attorneys' fees. Second, Easton fails to explain how the Bank's erroneous interpretation of the letter constituted either willful misconduct or a wanton disregard of her rights. Willful misconduct is "[m]isconduct committed voluntarily and intentionally," and "misconduct" is "[a] dereliction of duty; unlawful or improper behavior." Black's Law Dictionary 1013-14 (7th ed. 1999). Easton presents no authority or evidence indicating that the Bank's conduct meets this standard. Further, she identifies no right which the Bank could have wantonly disregarded. Accordingly, I will grant the Bank's motion for summary judgment against Easton, and deny Easton's cross-motion.

---

[14]Easton complains of other conduct as well, but the details are unimportant.

### D. Easton's Claims Against Morgan

Easton argues that Morgan breached the trust agreement by attempting to draw on the credit without first looking to its security interest in the herd and equipment and its mortgage and without having received a non-renewal notice, and that it is therefore liable for her costs and attorneys' fees in the present suit and for any sum she might be found to owe the Bank under the reimbursement and application agreements. Morgan counters that Easton lacks standing to sue under the trust agreement because she was not a party to it, to which Easton responds that she is a third-party beneficiary because the agreement contains terms intended to benefit her. However, the trust agreement provides that the bondholders are the only third-party beneficiaries:

> 16. <u>Rights and Immunities.</u> The registered owners of the Bonds are intended by the parties to this Trust Agreement to be third-party creditor beneficiaries hereof entitled to assert or exercise all rights and remedies contained herein through the Trustee. <u>Except as herein otherwise expressly provided, nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity, other than the Corporation, the Trustee and the registered owners from time to time of the Bonds, any right, remedy or claim under or by reason hereof or any covenant, condition or stipulation hereof.</u>

(Trust Agreement ¶ 16) (emphasis added).[15] Because the trust agreement does not "expressly provide[]" Easton with rights, she may not maintain an action under it.

---

[15] The trust agreement is attached as Exhibit 2 to Morgan's brief in opposition to Easton's motion for summary judgment [R. 96].

15

Nonetheless, Morgan is liable to Easton for breach of warranty.[16] Under Wis. Stat. § 405.111(1), a "beneficiary by . . . presenting a documentary draft or demand for payment warrants to all interested parties that the necessary conditions of the credit have been complied with." This provision enables an applicant in a standby letter of credit case to proceed against a beneficiary who falsely certifies that the conditions of the credit have been satisfied. See Dolan, Article 5 Warranties, supra, at 349, 357-58. As discussed, in the present case Morgan falsely certified that the Bank had provided it with a non-renewal notice. By doing so, Morgan breached its warranty to Easton and is liable to her for the damages she incurred because of the breach. See id. at 358 (explaining that damages for breach of warranty are those suffered as a consequence of the breach).

## IV. CONCLUSION

The Bank did not send Morgan a notice of non-renewal; therefore, Morgan's certification to the contrary was fraudulent. As a result, Wis. Stat. § 405.114(2) authorized the Bank to dishonor Morgan's draw. Further, the Bank may recover its expenses and attorneys' fees from Easton pursuant to its agreement with her. Finally, Morgan's false certification constituted a breach of warranty under Wis. Stat. § 405.111, and thus Morgan

---

[16]I apply Wisconsin law to Easton's breach of warranty claim because, although Minnesota law is potentially applicable, the Minnesota and Wisconsin breach of warranty provisions are not materially different. However, I note that although the version of Article 5 enacted by Minnesota allows a "prevailing party" to recover "[r]easonable attorney's fees and other expenses of litigation," Minn. Stat. § 336.5-111(3), the Wisconsin version does not. Thus, there is a genuine conflict between Wisconsin and Minnesota law concerning the relief to which Easton is entitled based on Morgan's breach of warranty. However, the parties have not adequately briefed this issue. Easton argues that the application agreement selects Minnesota law. However, Morgan was not a party to such agreement and therefore is not bound by its choice of law. Yet, Morgan offers no reason for choosing Wisconsin law over Minnesota law. I will therefore reserve judgment on this issue and order additional briefs.

16

is liable to Easton for any resulting damages, including the Bank's expenses and attorneys' fees. These conclusions resolve the pending motions, but leave several issues outstanding, including Morgan's liability for Easton's attorneys' fees and the calculation of the Bank's expenses and attorneys' fees. Therefore, I will hold a telephonic status conference to determine how to proceed.

Accordingly:

**IT IS ORDERED** that Morgan's motion to dismiss is **DENIED**, that Morgan's motion for summary judgment against the Bank is **DENIED**, that the Bank's motion for summary judgment against Morgan is **GRANTED**, that the Bank's motion for summary judgment against Easton is **GRANTED**, that Easton's motion for summary judgment against the Bank is **DENIED**, and that Easton's motion for summary judgment against Morgan is **GRANTED**.

**IT IS FURTHER ORDERED** that a telephonic status conference will be held on **August 19, 2005 at 2:30 p.m. CDT.** The court will initiate the call.

Dated at Milwaukee, Wisconsin this 9 day of August, 2005.

/s_____
LYNN ADELMAN
District Judge

17